IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STAN FALK,                                        *
                                                  *
                      Plaintiff,                  *
                                                  *
vs.                                               *        No. 4:06CV00506 SWW
                                                  *
MARTHA PHILLIPS, Individually and in her          *
Official Capacity as Employee of the Division     *
of Health, Arkansas Department of Health and      *
Human Services; CHARLES McGREW,                   *
Individually and in his Official Capacity as      *
Employee of the Division of Health, Arkansas      *
Department of Health and Human Services;          *
PAUL HALVERSON, Individually and in his           *
Official Capacity as the Director of the          *
Division of Health, Arkansas Department of        *
Health and Human Services; and DR. GLEN           *
BAKER, Individually and in his Official           *
Capacity as Director of the Public Health         *
Laboratory, Division of Health, Arkansas          *
Department of Health and Human Services;          *
                                                  *
                      Defendants.                 *

**Memorandum Opinion and Order**

Before the Court is defendants' motion for summary judgment to which plaintiff

responded.  After careful consideration of the motion, response, briefs, statements of facts,

exhibits, and attachments, the Court finds the motion should be granted.

**Background**

Plaintiff Stan Falk is a former employee of the Arkansas Department of Health

("ADH").[1]  He began his employment at the ADH in 1976 and retired effective April 1, 2006.

---

[1]In August 2005, pursuant to a state statute, the ADH merged with the Arkansas Department of
Human Services, creating the Arkansas Department of Health and Human Services (ADHHS).  Subsequently,

During his tenure with the ADH, Falk held several positions, including acting director of the Public Health Laboratory ("PHL"). At the time of his retirement, he was Assistant Director of the PHL. In addition to the central unit lab, the ADH has at least one local health unit ("LHU") in each county in the state. All the labs must be certified for compliance with CLIA regulations.[2] The Centers for Medicaid and Medicare Services ("CMS") is the federal regulatory agency charged with ensuring compliance with CLIA mandates. Federal regulatory inspectors, called surveyors, conduct regularly scheduled inspections at least every two years.

When Michael Loeffelholz was named Director of the PHL in August 2003, Falk became Assistant Director. Mot. Summ. J., Falk Dep. at 31. Falk testified he "was in charge of chemical hygiene and biological safety issues, for the maintenance of the facility and the operation of the BSL-3 [Bio-Safety Level 3] laboratory." *Id.* at 22. In 2004, the Director assigned Falk additional responsibilities, naming him Interim Section Director of Newborn Screening. He handled the administrative issues, such as making sure all of the personnel reviews are done and that the staff had the supplies and equipment they needed. *Id.* as 23. He also conducted chemical hygiene and bio-safety training as well as some CLIA training. *Id.* at 24. A man named Mani[3] was in charge of the technical aspects of Newborn Screening which, according to Falk, included quality control and assurance. *Id.* at 23.

---

a state statute was passed, authorizing the Governor to separate the agencies. In July 2007, the two agencies de-merged.

[2]CLIA stands for the Clinical Laboratory Improvement Act of 1988.

[3]The Court assumes "Manny" refers to Dr. Mani Chidambarram, a chemist with the PHL. *See* Resp. to Mot. Summ. J., Ex. 8.

Falk testified that in late October 2004, he learned that in August 2004, Mani took a proficiency test specimen[4] to an outside lab to be tested. *Id.* at 61-2. Falk testified that Keisha Payne, a lab technician, told him Mani was concerned that an analysis she performed might be in error and he asked the Director if he could take the specimen to another lab. He ended up taking the specimen to the VA hospital. *Id.* at 62-4. Falk testified that when he returned from a trip, he asked Mani about the incident and Mani confirmed that he had done it. *Id.* at 65-66. Falk said he told Mani that CLIA regulations forbid taking proficiency samples to an outside lab, and asked Mani to inform the CLIA inspectors and the Director. Falk said he and Mani both informed the Director on approximately November 1, 2004. Falk said he also told Pat Darcy, his quality assurance coordinator. *Id.* at 68.

At Falk's request, Mani prepared a Corrective Action Plan, which was provided to the Director in November 2004. Falk said he also conducted additional training with Mani. *Id* at 75, 80. Falk said that when he suggested to the Director that they self-report the violation, the Director's response was "maybe they won't find it." *Id*. at 83. Falk said they needed to self report; that the CLIA regulations say that if you are a laboratory and someone brings a proficiency test specimen to you, you are to immediately report that laboratory to the CLIA surveyor. *Id.* at 83.

On or about February 11, 2005, Sandy Pearson, a surveyor for CMS, was in town surveying LHUs and helping the central unit prepare for its upcoming inspection. Falk said the lab asked Pearson to come in and do some training on the CLIA regulations. *Id.* at 45-6. Falk said he found out that the Virology Laboratory was reporting out unvalidated influenza results,

---

[4]According to the complaint, proficiency test samples concern the testing of newborns. Am. Compl. at 14.

and during a meeting with Pearson and "all of the supervisors and the lab personnel," Falk questioned the lab person representing the Virology Laboratory as to whether they were testing for influenza and whether the results are being reported directly to the physicians.  The lab person said they were testing but said she did not want to talk about the reporting because she did not want to get in trouble.  *Id.* at 48.  Falk said the lab person did eventually admit the results were being reported.  *Id.* at 49.  Falk said it was part of his job responsibilities to make sure the reporting was being done properly.  *Id.* at 48-49.  Falk said he then told Pearson he would like to have lunch with her because he had some "serious issues to talk to [her] about."  *Id.* at 49.  Falk claims that during that lunch, he asked Pearson if she had heard from the Director.  When she said no, Falk said he told Pearson about the influenza reporting violation and the proficiency test violation, *id.* at 84-5, but told her he was not officially self-reporting, *id.* at 97, and was not doing it as a part of his role as Quality Assurance Office."  *Id.* at 49.[5]

On March 21, 2005, CMS surveyors arrived at the Arkansas PHL to conduct their routine inspection of the laboratory.  They found a number of deficiencies, including that the lab intentionally referred a Newborn Screening proficiency test sample to an outside laboratory which was a direct violation of the CLIA regulations.  The violation called for a mandatory revocation of the lab's operating certification.  *See* Mot. Summ. J., Ex. 7.  The upper management of ADH determined that the lab had to be brought into compliance and hired an outside consultant.  In the meantime, the ADH merged with the Department of Human Services,

---

[5]Defendants dispute whether Falk in fact told Pearson about the proficiency test incident.  Pearson said at one point she did not recall Falk telling her.  *See* Mot. Summ.J., Falk Dep. at 106.  Defendants also contend that if Falk had reported the incident, the surveyors would have taken action immediately in light of the seriousness of the violation.  For purposes of the motion for summary judgment, the Court assumes Falk told Pearson.

and the PHL was allowed to continue to operate with restrictions with the new combined agency as the certificate holder.  Newborn Screening, however, was suspended at the PHL until compliance was achieved.  The ADH conducted an investigation, and in November 2005, Falk was demoted.  *Id.,* Ex. 3.  He subsequently resigned in April 2006.  *Id.,* Ex. 4.

Falk alleges he was demoted and forced into retirement because he told Pearson, the CMS/CLIA surveyor, about the proficiency test incident.  He contends defendants violated his First Amendment right to free speech by retaliating against him for reporting the incident to federal regulators.

Defendants move for summary judgment arguing Falk cannot establish his speech was protected and, even if he can, there is no evidence he was disciplined because of his speech or that he was constructively discharged.  Defendants also argue they are entitled to qualified immunity.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  The non-moving party may not rest on mere allegations or denials of

his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citations omitted). Further, summary judgment is particularly appropriate where an unresolved issue is primarily legal, rather than factual. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

## Discussion

Falk asserts defendants violated his rights under the First Amendment. Defendants argue they are entitled to summary judgment because Falk's alleged statement was not the cause of his alleged constructive discharge and that Falk's speech is not protected because it was part of his job duties.

The individual defendants assert that they are entitled to qualified immunity as to Falk's claims against them in their individual capacities. For the reasons stated below, the Court agrees. "Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting

the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . .

*Saucier v. Katz,* 533 U.S. 194, 201-202 (2001).

To establish a claim of unlawful retaliation for protected speech, a public employee must prove that he spoke out as a citizen, on a matter of public concern; the defendant took adverse employment action against him; and his protected speech was a substantial or material factor in the adverse employment action.  *See Altonen v. City of Minneapolis,* 487 F.3d 554, 559 (8th Cir. 2007)(citation omitted).  Falk alleges defendants terminated him in retaliation for speaking with the surveyor from CLIA.  He argues, however, that even though he was speaking about a subject that was part of his employment, there is a material issue of fact was to whether the speech was a part of his job duties.

"To decide whether a public employee's speech is protected by the First Amendment, a court must first determine whether the employee spoke as a citizen on a matter of public concern." *McGee v. Public Water Supply Dist #2 of Jefferson Co., Mo.,* 471 F.3d 918. 920 (8th Cir. 2006)(quotation omitted).  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 126 S.Ct. 1951, 1960 (2006).  "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that

conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 1962.

Falk testified he had some responsibility with quality assurance and quality control issues but he "had a helper" who was responsible for most of it. *See* Mot. Summ J., Falk Dep. at 22. He said that when the Director asked him to be the interim section director for Newborn Screening, he made it very clear that he could only operate in an administrative role because he was not qualified for the technical side, and because he thought it would be a conflict of interest to be involved in quality assurance in the Newborn Screening lab as he was already in charge of overall quality assurance. Falk said he told the Director he could advise Newborn Screening on quality assurance issues but quality assurance could not fall under his purview. *Id.* Falk said he was never responsible for training the staff as far as CLIA was concerned, but he also said he and Jason Lee[6] would give local health units "extensive training" on the CLIA regulations that pertained to them, and he did a "similar presentation, but it was a little more involved with the staff at the . . . Central Unit." *Id.* at 25.

Falk asserts it was not a part of his job responsibilities to report deficiencies to the federal authorities; that his responsibilities required him to report to the Director only. *See* Resp. to Mot. Summ. J., Falk Aff. He submits an e-mail he received from the Director in December 2003, in which Loeffelholz told Falk: "Functionally, we don't have an assistant director. Rather, we have a team of senior directors . . . who report to me." *See* Resp. to Mot. Summ. J., Ex. 2. He also submits the testimony of separate defendant Phillips who said that she was not sure it

---

[6]Jason Lee was the Section Director for Microbiology and LHU lab director, responsible with Falk for implementing and making sure the labs were complying with regulations. *See* Mot. Summ. J., Falk Dep. at 15; Resp. to Mot. Summ. J., Ex. 2 (organizational chart).

was a part of Falk's job description to report the actions of the lab to the federal authorities, *id.*, Ex. 3 at 25, and the testimony of Dr. Bates, an advisor to the Director and part of the Director's leadership team, who said he thought it would have been the Director's job to report violations. *Id.,* Ex. 5 at 28.

In support of his argument, Falk cites *Lindsey v. City of Orrick, Missouri,* 491 F.3d 892 (8th Cir. 2007). In *Lindsey,* the Eighth Circuit held that where an employee whose job duties included attending city council meetings to report on park, water, sewer, and street maintenance deviated from his report to lecture the City that it was violating state sunshine law requirements, and there was no evidence that his job duties included checking for sunshine law compliance, the employee was speaking as a citizen and not as part of his official duties.

In *McGee v. Public Water Supply Dist. # 2 of Jefferson County, Mo.,* 471 F.3d 918 (8th Cir. 2006), the court held that McGee, the district manager, was not speaking as a citizen when he complained to two board members about environmental compliance of two district projects. McGee argued he was "removed from the water pipe relocation project and was told not to concern himself with the septic tank problem; therefore, his statements regarding environmental compliance were not made pursuant to his official job duties." *Id.* at 921. The court held that the projects fell within McGee's "overall supervisory duties as District Manager and his admitted duty to advise the Board regarding regulatory and legal requirements." *Id.* In *Bradley v. James,* 479 F.3d 536 (8th Cir. 2007), the court held that a university campus police officer had an official responsibility to cooperate with an investigation of an incident that occurred on campus and, therefore, his speech was pursuant to his official and professional duties. The court noted that the plaintiffs allegations were made at no time other than during the investigation.

"[T]he question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker v. Chaffinch,* 501 F.3d 231, 240 (3rd Cir. 2007).   Falk's job performance evaluations and his job duties indicate he had responsibilities for training, quality assurance, quality control, and proficiency testing procedures.  *See* Mot. Summ. J., Exs. 1 and 2.  One of his major functions and job tasks as Assistant Director is "Technical Assistance, monitors the data provided by PHLabs as part of the assurance of accuracy and reliability."  *Id.*  Falk testified he delegated many of the responsibilities of quality assurance to his quality assurance coordinator,  Mot. Summ. J., Falk Dep. at 37, but admits that part of his role was to insure accurate and reliable testing results on proficiency tests.  *Id*. at 77-78.  Falk also admits that when he was Interim Director, he would have expected that person to self-report:

> Q: Stan, when you were the Interim Director over all the lab, if something had come to your attention like this . . . if somebody in your role had came [sic] to you, would you have expected them to self-report that to CLIA?
>
> A: I would have expected that.  Yes.  Absolutely.
>
> Q: And in your role as Interim Director, you would not have determined or in any way said that was a violation of any policy or regulation of the Department of Health?
>
> A: I would certainly hope not.

*Id.* at 98.  The parties agree that Falk prepared an affidavit at the request of ADH to document and affirm his meeting with Pearson in February 2005.   *See* Defs.' Statement of Undisputed Facts at 14; Pl's. Resp. to Defs.' Statement of Undisputed Facts at 14.  Dr. Bates testified that he "spoke on numerous occasions about the fact that we self-reported and thought of that as a good citizen act on our part, and used that, without success, with CLIA to say you shouldn't punish us so severely for this violation." Resp. to Mot. Summ. J., Ex. 5 (Bates Dep.) at 10.

"[S]peech may be made pursuant to an employee's official duties even if it deals with activities that an employee is not expressly required to perform.  The ultimate question is whether the employee speaks as a citizen or as a government employee - an individual acting 'in his or her professional capacity.'  Consequently, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."  *Brammer-Hoelter v. Twin Peaks Charter Academy,* 492 F.3d 1192, 1203 (10th Cir. 2007) (citation omitted).

Just prior to having lunch with Pearson, Falk and other staff members were meeting with her.  Falk testified he brought up the mis-reporting of influenza results in that meeting, prompting a staff member of the Virology Lab to admit to faulty reporting.  *See* Mot. Summ. J., Falk Aff. at 49.  During lunch, Falk says he proceeded to tell Pearson about the questionable actions regarding influenza reporting and the proficiency test screening.  While Falk says he put on his "public citizen hat" when he was speaking with Pearson at lunch, he apparently was speaking pursuant to his official and professional duties in the meeting just before lunch.  The information allegedly supplied to Pearson pertains to Falk's employment and is a direct result of his employment.  He acted as a government employee when he spoke with Pearson; he did not make a public statement or inform the news media about the violation.

The Court concludes Falk's speech was pursuant to his official and professional duties and that he was not speaking as a citizen when he reported problems at the lab to the federal surveyor.  It is clear that Falk's job duties included quality assurance and quality control.

The Court further finds that there is no evidence from which a reasonable jury could conclude that Falk was constructively discharged for reporting the violation.  He said no one told him he was subject to disciplinary action because he reported the violations to Pearson, but complains that the disciplinary procedures were not followed.  Mot. Summ. J. at 100.  He said Phillips told him the committee was considering what disciplinary action they were going to take against him and he had 24 hours to respond to the charges but she would not tell him what the charges were.  *Id.* at 102.  Falk received a demotion and a final written warning in November 2005.  He complains that he was never assigned any job duties and defendants harassed him about moving his office.   He also points out that no other people who left employment at the lab received any formal documented punishment.  The record reflects that in November 2005, Jason Lee was given the option of being fired, resigning or starting retirement; Lee resigned effective December 2005.  Mani Chidambarram resigned his position effective November 2005, and Mike Loeffelholz resigned effective November 5, 2005.

Falk was the person whose formal job duties included quality assurance and quality control.  The federal regulators issued two deficiency reports where they found numerous problems in the PHL, including the local health unit laboratories.  The PHL was cited for serious deficiencies and its certificate to operate the main laboratory was revoked for at least one year.  Falk submits no evidence from which a reasonable jury could find that his report to Pearson was a substantial or material factor in the decision to demote him.

The Court further finds no evidence that Falk was constructively discharged.  To prove constructive discharge, a plaintiff must show: 1) a reasonable person in his situation would find the working conditions intolerable; and 2) his employer intended to force him to quit.  *Devin v.*

*Schwan's Home Serv., Inc.,* 491 F.3d 778, 789 (8th Cir. 2007). "'The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment, and additionally the plaintiff must subjectively perceive the environment to be abusive.'" *Id.* (citation omitted).

After carefully reviewing the record, the Court finds Falk fails to establish that he was constructively discharged. Falk testified that after he served his 14-day suspension, he was re-assigned. *See* Mot. Summ. J., Falk Dep. at 109. Apparently, one of his new duties was to be doing work with the Mass Spectroscope. *Id.* at 128, 140. In January 2006, he notified defendant Baker that he had been diagnosed with carpel tunnel syndrome and would not be able to perform bench work. Falk said at that point Baker told Falk he wanted to talk to Human Resources before deciding on Falk's job duties. *Id.* at 128-29. Baker did ask Falk to move his office downstairs, and Falk said he hired a moving crew to move him because the maintenance people were busy. *Id.* at 129-131.

Falk said he retired because of the "ruthless behavior" by the ADH. He said his disciplinary action was not handled according to policy and he was continually asked to complete a form setting out his job responsibilities duties. He testified "there were certain analytical responsibilities that I was going to have to do. And that if I couldn't do them, well, there was no accommodation and they would have to let me go because I was filling a position that required analytical capability. I mean, you know, I can read between the lines." *Id.* at 138-9. He also complained about the fact that he could not get help moving his office and that defendants told him not to discuss his reassignment with any of the people downstairs. *Id.* at 144. Falk testified that between December and April he was reading and studying and there was

13

not anything for him to do.  *Id.* at 139.  He said he never did fill out the form saying what his job duties would be because he did not know what his position was.  *Id.* at 141-42.  Eventually Falk told defendants he was retiring because his daughter was ill.  He said he needed to keep his insurance for his family and would lose coverage if he were fired.  *Id.* at 141-2.

While Falk was obviously uncomfortable and frustrated with his situation, the Court cannot find that he has established that he was subjected to an objectively hostile or abusive work environment.

## Conclusion

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [docket entry 28] is granted.  Plaintiff's complaint is dismissed.  Judgment will be enter accordingly.

DATED this 20th day of December 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE